Thank you for supporting what we call the Environmental Inc. v. Meccan Industries. Our attorneys for both sides here. I want you to get settled. Both sides approach the podium and tell us who you are and who you represent. The case has been called. Good morning, Your Honors. Edward Livingston for the Appellant and Defendant, Meccan Industries. Good morning, Your Honor. John Sopata, SOPATA, on behalf of the Appellee, Galaxy Environmental, Inc. And good morning, Your Honor. Kevin McKessie, also on behalf of the Appellee, Galaxy Environmental, Inc. And only Mr. Sopata will be arguing? Only Mr. Sopata will be arguing. Very good. Each side has 15 minutes. We don't look at our watch. As you can see, the other one got done a little bit early. But hopefully you picked up that we do read the briefs. We're familiar with the facts of your case. So we'll behoove you, both sides, to get to your strongest point first without reciting the facts of the case. So anytime you're ready, Mr. Livingston. Thank you. And we'll give you some time for reply as well. I'm sorry? When you get done, Mr. Livingston, we'll give you some time for reply. Thank you, Judge. Your Honors, to please the Court, issued before the Court this morning is whether or not the trial court's finding of an implied waiver was correct under Illinois law. It was, with all respect to the trial court, it was not. I think that it should be clear from the briefings that the real heart of the question in this case is, who has the burden of ensuring compliance with the terms of a contract which both parties have entered into? I think the answer to that question hangs upon whether or not a conditioned precedent was a part of the terms and conditions of that contract. In this case, we do not have a conditioned precedent. The Wayland line of cases that both parties have extensively briefed, there are always two key distinctions that are looked at by the courts as to whether an implied waiver has been found. The first is, was there a conditioned precedent? Did the party seeking a certain performance from the other party say that this action must be done prior to us entering into you performing any other work on the contract? The other key distinction is whether or not the party that is alleged to have waived seeks at the end of it to reach back into what is essentially a closed relationship. And that is established by, you know, all the work's been completed and the other party has been completely paid for their work. And then after complete payment happens, the other party comes back in and tries to recover some of the money that has already been paid for their work. And the other key distinction is whether or not a conditioned precedent was a part of the terms and conditions of that contract. And that is established by, you know, all the work's been completed and the other party has been completely paid for their work. And then after complete payment happens, the other party comes back in and tries to recover some of the money that has already been paid for their work. And the other key distinction is whether or not a conditioned precedent was a part of the terms and conditions of that contract.   Now, in regard to the findings by the trial court, Illinois law is clear that in a case where, on summary judgment, where the trial court seeks to find implied waiver, there has to be two elements established. First is that all conduct established by the undisputed facts must present a clear inference and no other inference that the party that is alleged to have waived either intended to waive that or that no other inference can be drawn as to their intention to waive. The other factor that has to be present is that there has to be a reasonable belief by the party alleging a waiver that the party alleged to have waived actually intended to waive. We don't have either of those in this case. Well, we have Mr. Salinas' testimony that he had a conversation and it was waived, that they were happy with the $1 million contract. We do, Your Honor. Two points on that. First is that, as pointed out in the briefs, that is the only evidence we have that there was ever any express knowledge of waiver. And that is testimony by the president of the company that now seeks to establish waiver. I mean, that testimony should just be taken for what it is. It's testimony of an interested party. The other point on that is that that — That's what you have in all contract disputes. I recall having a contract dispute where the parties who were of interest didn't have some testimony. I agree, Your Honor. But the second point to be made by that is even if we accept that that conversation occurred as related by Mr. Salinas, that occurs prior to the signing of the subcontract, which the subcontract contains an integration clause which says that no other prior oral agreements or written agreements shall apply and that the terms of the subcontract govern the relationship between the parties. The terms of the subcontract are very clear as to what insurance requirements MECON expected to receive from Galaxy. So I believe that that testimony does not actually go to whether or not we have a waiver. And, again, we're back to the question of whether there's an implied waiver. The briefs don't refer, though, to any counteraffidavits or deposition testimony where somebody from MECON said, no, I did not have that conversation with Salinas. That's just not true. Mr. Flynn did not testify. Mr. Flynn simply stated that he acknowledged that there had been a conversation between him and Mr. Salinas. He could not remember the content of that conversation. I mean, this would have been back in 2000, you know, and Mr. Flynn was having conversations with several subcontractors during that period of time. But, again, Your Honor, as I said, even if we accept that Mr. Salinas' version of the event is true, it still does not go to whether a waiver occurred because it is prior to the signing of the subcontract which Mr. Salinas himself signed. He agreed to those terms and conditions explicitly through his signing of the subcontract. I think that, again, going back to the inferences that you can draw from the conduct of MECON in this case, we obviously, the trial court is burdened with looking at those, the undisputed facts, looking at the inferences that can be drawn from those facts and making a determination as to whether the inferences are clear and unambiguous as to the fact of waiver. Even in a case where the facts themselves are undisputed, if the inferences to be drawn from those facts are competing, then it's improper for summary judgment. The trial court would be improper to grant summary judgment in this case. And I think that's clearly what we have. We obviously believe that the inferences to be drawn from the facts favor MECON, the fact that they did not intend to waive, but we acknowledge that there is at least competing inferences in this case. And I think that our acknowledgment, the fact of those competing inferences, is also shown by the fact that we have not sought to an appeal of our motion for summary judgment on our counterclaim for breach of contract. When we looked at this case during the motions for summary judgment stage, we saw this as a very clear-cut case that could be cited on the documents presented before us. I think in light of the direction we received from the trial court in regard to intent and a more now, more fuller understanding of the law in this area, it's probably true that this was never a case that should have been presented to the court for summary judgment. Setting that aside, however, the reason we are here today is because the trial court and perhaps the parties to a certain extent during the briefing in the trial court below did not fully appreciate the implication of the presence or absence of a conditioned president in the contract. The trial court's decision to grant or to find waiver in this case where there was no conditioned precedent is clearly against the decisions that are established in the Wayland line of cases. In every case where a waiver is found, you see a conditioned precedent. In the cases where waiver is not found, there is either no conditioned precedent or there is a presence of actual mistake. What you don't see is any case where waiver is not found and there's a conditioned precedent in the contract. And if you think about this, this makes perfect sense. When a party contracts with a conditioned precedent, what that party seeking that condition is saying is, this aspect of the contract is so important to me that I will take on the burden of making sure that you comply with that aspect of the contract. That's what is the case in Wayland. And I think it's one thing I also want to make sure is we are not seeking to overturn Wayland. We think Wayland is good law. We just think that the application of Wayland to our case by the trial court was an error according to the precedent that's actually established. When there is no conditioned precedent, it makes both legal and business sense for compliance with the terms of the contract to be on the party whose performance is being sought. They are the party who is closest to the issue. They are the party that has the, they're in the best position to ensure their own compliance. Especially in these large, very complex contract cases where there are numerous, I think there were several dozen subcontractors on this case. What the appellee is arguing for is a standard whereby mere superficial compliance would shift the burden over to the general contractor. And if by merely, you know, setting forth something that appears to comply with the contract, it then becomes the burden of the general contractor to ensure that they have actually complied. So, as I laid out in the brief, if the subcontracting party, if the general contractor misses the fact, it's mistaken as to the subcontractor's actual performance, and they do not, then they, let me back up, I'm sorry. If the general contractor finds out, after superficial compliance by the subcontractor, if the general contractor looks at it and says, this isn't correct, this does not conform to the terms, the subcontractor can say, oops, sorry, you know, you're correct, we'll comply. If they actually get past the goal post and the general contractor misses it, they can either, you know, then it becomes an issue where down the road, if there is a case where that condition would come into play, the subcontractor can say, well, you waived it because you didn't do it. And I think, and again, it goes back to, I think, the key question of this case is, does the presence of a condition precedent matter under Illinois law? And I believe it does, and I believe the cases make that explicit. And if that is true, then the burden was not on Macon to ensure compliance in this case, and there is no implied waiver. Why don't you save some time? We'll hear from the other side, and you can hear as long as you want for our rebuttal. Mr. Cipana. Good morning, Your Honors. Good morning. Condition precedent seemed to be a point that the appellant was really trying to drive home. And, in fact, condition precedent was addressed in Geier, G-E-I-E-R, versus Hammer Enterprises, which is a case that has been cited in our brief. In that case, the contractor tried to make the exact same argument, that it was a condition precedent rather than a subsequent obligation or an ongoing obligation. And in Geier, the contractor maintained that Wayland does not apply here because the contract language there prohibited the commencement of work until all insurance had been obtained, while no such prohibition was contained in the contract between Hammer and Coleman. I'm reading from page 323 of Geier versus Hammer Enterprises. Well, before we get to the case, let me go back to the facts of the case. Mr. Zlinas testified that when I got the contract, it was for $11,000, and I explained to Mr. Flynn that if I got the $5 million coverage he wanted me to get, it would cost me $20,000 just for the insurance. And I'm not going to do that. I can't afford to do that. And Flynn said he understood, so we moved on. But then you look, and this all comes from your brief. This is at page 5. Correct. So as time goes on, change orders come through, and some are for substantial sums of money. So until August 30th, changes had been made to the point where now Mr. Zlinas' company has now received $87,000 worth of business. Correct. And then on that date, August 30th, he gets two-thirds of a million dollars additional, making it about a three-quarters of a million dollar contract. So he's no longer going to lose $8,000. Rather, he's going to take net profit, of course, of $730,000, but a large amount. He now has a contract worth three-quarters of a million dollars. And he still doesn't increase his insurance, does he? He does not, Your Honor, because that conversation is presented. It's not the cornerstone of our argument, nor was it the cornerstone of Judge McGrath's decision. That was presented to show that Mr. Zlinas' belief that it had been waived was certainly reasonable, because as far as he knew, MECON had waived the requirement, and, in fact, he had provided Accord certificates of insurance on four occasions to MECON. And so now we go to that, and that's at the bottom of your page 6. So you go to the Accords, and there's at least two of them here, all of which say on the front page, aggregate, general aggregate. Again, as mentioned in your brief, $5 million coverage. Correct. $5 million. Did Mr. Zlinas have $5 million in coverage for this project? He has. The certificate indicates $5 million of general aggregate insurance. Mr. Flynn testified that he has a sophisticated knowledge of insurance. MECON is a very sophisticated company. Three or four persons at MECON on the executive level had reviewed this and approved it. What does that mean? If I submit an insurance certificate that says I have aggregate insurance of $5 million coverage, how much coverage do I have? I have $1 million per occurrence, and I have $5 million in the aggregate. Okay. And the $5 million, the aggregate does not mean excess. That's right. So if there's $1 million occurrence, which occurred because this person was so seriously hurt, that cuts off $1 million. Is that right? I mean, my personal, John Zapata's interpretation and knowledge of this insurance certificate is not as relative, I'm sorry, not as relevant as MECON's and Galaxy's perception. But if you're asking me, Your Honor, $1 million is per occurrence. There was one injury, the Malgoza injury, so we've got $1 million of coverage for the Malgoza injury. But access to $5 million in coverage. Otherwise, why is it there? Well, let's say that the next day another person had falling or the next day another person on top of that had falling. These are separate occurrences and an aggregate coverage of $5 million. Again, this case is here on summary judgment? Correct. And this is so clear that the MECON was on notice, I'm sorry, rather, yes, that MECON was on notice that there was only $1 million in coverage and not $5 million. Correct, Your Honor. If I could call your attention just to the top of page 7 in our brief, we put an excerpt of a typical insurance certificate and it says each occurrence $1 million. And more importantly, as Waylon, as a court held in Waylon, MECON is charged with anything with knowledge, anything that upon reasonable diligence it could find out. It is charged with knowledge of that. And certainly just simply looking at the insurance certificate, which was in the exact form they asked for a court, one could see each occurrence $1 million. Excess umbrella liability was zero or actually blank on those forms as well. Okay, go ahead. Okay, great. I'm sorry, thank you, Your Honor. If I may, getting back to the condition precedent, which seemed to be a heavy part of the appellant's argument, in Hammer, I'm sorry, Guyer, that contractor made that exact same argument and the Illinois appellate court rejected it. Hammer maintains that a requirement for a certificate of insurance is distinct from a subsequent requirement to procure and maintain insurance for the duration of the contract. And the court upheld Waylon and essentially said, we will not artificially separate the obligation to procure and maintain insurance under the contractual language here. Coleman could not maintain insurance until it had initially procured the insurance. In other words, they made that exact same argument in trying to distinguish their situation from Waylon based on a condition precedent, and the court in Guyer rejected that. In other words, you can't maintain it unless you procure it. It's an artificial distinction. Waiver is not limited to condition precedent. Any provision of a contract can be waived. And in our case, we're arguing that the $5 million general umbrella liability was waived. And again, there's no case authority before this Court that says that waiver has never been limited to a condition precedent in a contract. But waiver can be any provision of a contract. Well, under both Waylon and Guyer, again, Guyer following Waylon, I don't say lockstep, but they're very close, neither general contractor asked to see any certificates of insurance. And in both cases, they fully paid the subcontractor before they tried to go back and say, we want money for this bad result that occurred. Isn't that correct? In Waylon, the contractors were paid. Guyer, what you're getting to is the closed relationship argument, I believe, that the appellee made. Two things. One, getting away from the idea of condition precedent, but the idea being that in both of those cases, Waylon and Guyer, the general contractor, the person up the chain, had already fully paid the person down the chain, unlike here. Correct? So Mekon had not fully paid Galaxy. They're suggesting that is significant, that that is different than what occurred in both Guyer and in Waylon. Is that correct? Waylon, correct. Guyer, the facts are fairly light in the opinion. Prior to, so the last page of Guyer, we hold this trial court correctly found that Hamer waived any contractual obligation of Coleman to procure liability insurance by its failure to require Coleman to provide certificates of insurance, which these people did, prior to the commencement work, or prior to Coleman's being paid in full when it completed the job, which again is different than here. So in both cases, the general did not ask for a certificate of insurance and did not raise any complaint about it until after the job had been completed and the sub had been paid in full. And that is different than here. Why should that not matter? Well, I would argue that it's more persuasive that we are not reaching back into a closed relationship, that Mekon knew unequivocally in early February of 2002, by their admission. Our position would be that they're charged with knowledge and they knew much earlier. But they continued to issue change orders and they never told Galaxy it wasn't going to be paid until 2003, long after all the work was completed. So you go to page 11 of your brief and it says reading, it is further undisputed that by late December 2001, meaning after the accident, after the man is seriously injured, or early 2002, Mekon was fully aware of the $1 million per occurrence coverage afforded by Galaxy's insurance policy. So meaning after the accident has occurred, and the sub's employee is seriously, seriously hurt, the general contractor becomes aware, by the way, the sub never did get $5 million in insurance. They got $1 million per occurrence insurance. That's after the accident. How does that help you? What helps is that they discussed withholding payment and they never did. They lulled Galaxy into completing the work. At this point, if they said, look, you only got $1 million and we're not going to pay you, Galaxy could have walked off the job. Galaxy could have done a lot of things. But as their internal email suggests, they talked about withholding payments amongst themselves, but they never did. In fact, they issued further change orders, issued a letter saying, go ahead and finish the work and we'll pay you, finish this punch list and we'll pay you down to 5% retainage, et cetera, et cetera. They never once said, you only got $1 million, we're not going to pay you until October of 2003. If I may, please. Sure. The sound you hear is a fire alarm. It is a drill. We are not part of that drill. I've asked them to turn it off in here and it's not as loud as it normally is, frankly. They always have their fire alarms on Wednesday mornings. I don't know why they do that, but it's not that loud. So I'd ask you to continue. So that's your argument, is that when they were aware of the accident, and this might lead to more than $1 million, they said, well, they could fire you or fire your client and say, you know, we're going after you. We're not sending any more checks because you failed to do what you said you were going to do. And then your client would not have a complaint about that because he didn't know. Well, more importantly, Galaxy could have made an informed decision had they been put on any kind of notice that they might not get paid. And what would their informed decision be? To do what? What were their choices? Had they said, you know, you gave us $1 million in coverage, we thought it was five, we're terminating your contract. What decisions could Galaxy make that would help them? They could have not. Essentially the argument, the amounts are consistent with essentially the last two change orders, both of which occurred after the Malgoza accident. So they could have not completed the work. They could have walked off the job and said. Well, they could have gotten sued then, right? Unless the Galaxy, I'm sorry, unless MECON had told them you're off the job, Galaxy really can't leave the job, right? I mean, they have a contract as well. So until they get formal notice from MECON that they're fired, they have to continue the work. Would that be right? Is that how a contract works? Well, they have to to the extent that they're, it would have been a preemptive breach. If MECON says that we're not going to pay you, then Galaxy can in fact walk off the job if they're not going to get paid. That's an interesting argument. But I'd suggest it's a real interesting argument that we should apply these two cases that involved no request by the general to see a certificate of insurance. Here we have a request and a requirement. We want to see your certificates. The certificates say, as you say they do, a $1 million per occurrence, but $5 million in aggregate, but nothing in the box for excess. And the argument is, well, they're on notice then. MECON knows because they're smart guys. Galaxy is a very small outfit. MECON knows very well that there's no excess here. If I may? Go ahead. Okay, Your Honor, thank you. I mean, what's important here is a lot of the case authority, I'll call it the trilogy of cases, LaValle, Lehman, and Batterman, there's a lot of inaction. What happened here was a real important distinction is that Galaxy welcomed MECON's review of its insurance certificate, encouraged it, welcomed it. They provided it to them on four occasions. And again, I can't overemphasize this. MECON even tweaked Galaxy's insurance to its liking by direct contact with Galaxy's insurance agent. And they even went on to say in an internal fax that, I hope they, meaning Mesereau Insurance, Galaxy's insurance agent, can follow simple directions to meet our requirements. So essentially, there isn't much more Galaxy could have done than provide their insurance, I'm sorry, their Accord Certificates insurance in the exact form that MECON asked for. Well, they could have asked for $5 million excess, a policy and paid for it. But nothing prevented them from meeting their obligation to do so. The question was, did MECON know it was waived and did Galaxy know it was waived? Did Galaxy legitimately sign that? I thought it was waived. We discussed it. Flynn had no problem with it. I then sent it in. It would indicate to some people that it was waived. That's why I didn't know. Correct, Your Honor. Consisting with Wayland, there was nothing that MECON did that would have led Galaxy to any other decision that it was waived, up and through until a month and a half after the Malgoza injury. And at that time, Galaxy did increase its insurance, but to $2 million. They didn't go to $5 million until July of 2002, noting that the lawsuit was filed in January of 2001. But essentially, excuse me, they, I'm sorry, I lost my train of thought. They welcomed the review of the insurance and MECON obliged. MECON obliged on numerous occasions. Well, here's the big issue then. They argued that if we agree with you, then aren't we saying, don't we have to hold an opinion to apply to every single case from just whatever day we issue it forward, that there is an obligation on the part of the contracting party to monitor the performance of the other side. And that if you fail to monitor it, and if the other side fails to perform, and you fail to bring this to everybody's attention and sue on it or bring it somehow to somebody's attention, that you've waived your rights under that contract. Well, it's not necessarily monitoring. It's the proactive step that they took. Essentially, if you don't want, if you're MECON and you don't want to waive a $5 million excess liability coverage, don't review Galaxy's Accord Certificate of Insurance, tweak it to your liking with their insurance company, give Galaxy its notices to proceed, pay Galaxy a considerable amount, 80%, 90% of the work, issue change orders before, during, and after the Mel-Goz incident, and then about 16, 17 months after the injury, say, oh yeah, we're not going to pay you. So in other words, it's not a matter of simply monitoring. It's the kind of corny analogy we use is it's like a perfect storm of waiver here. What more, I mean, they reviewed and approved. I mean, then they later on said it was a mistake. But the fact that they're admitting that it was a mistake or claiming it was a mistake, I should say, suggests nothing other than conduct consistent with waiver. And their intent is less important as their action, in our opinion. Their actions were to tweak the insurance. A very sophisticated level of knowledge is suggested with the tweaks that they made regarding the coverage. Let's go down that road. That's a problem you have. Many of these subs are small guys like Salinas. And they were going to say, well, the big guys like Mekon, it's at their peril when they contract with minority contractors or small contractors because those are unsophisticated contractors. So I'd suggest that's a concern we'd have to address somehow if we bought your argument that this was sufficient in this case for summary judgment to say that it's a matter of law. When you see aggregate $5 million, everybody knows that's not excess. That means it's $1 million. I mean, not everybody, but when a guy that suggests that question, so it sounds like you've got a pretty sophisticated knowledge of insurance. Would you agree or disagree with that statement? This is a question to Ed Flynn, the professional engineer project manager. With respect to contract compliance, I have learned how to check certificates against contract compliance. So here's a gentleman that states that he has a sophisticated knowledge of insurance certificates. So not everybody. And I wouldn't characterize Galaxy as an unsophisticated company in terms of their asbestos removal. You're correct that it is minority owned. And unequivocally, it's not disputed that they did a good job in the asbestos removal. I took an FME deposition of Mr. Selina saying they're a small company. I would have done it differently had I had a lawyer, but I'm a small guy. They're a big guy. I'm a little guy. Correct. And the small guy sought out and asked for the big guy's input on their insurance certificate. And Mekon didn't refuse or say that's not our problem, that's yours. They essentially said, sure, we'll review it. We'll see if it complies with the contract. And then they went on and said, yeah, it does. And essentially said, yes, it does comply with the contract. And only after the accident did they reevaluate their position. So the waiver occurred pursuant to the original subcontract. And that waiver occurred, occurred, occurred with every change order up and through the end of the project. And our argument would be whatever happened February 2002 is not particularly relevant to their waiver. Certainly Galaxy's belief was reasonable. And certainly their conduct, especially admitting that it was a mistake, was consistent with waiver. Mekon's conduct suggests. Mekon's, not Galaxy's. Right. So Galaxy didn't do anything by mistake. They knew all along what they were doing because they had to. They weren't making any, I mean, in a fraudulent sense, they're not fraud. They're not big guys at all. They're saying they're the ones being up front. And the argument is that Mekon made a mistake in understanding what they were given. Mekon's argument is that it was a mistake. We're not 100% convinced it was a mistake, but we're not saying that's particularly relevant. We're looking at the conduct and the court's interpretation of that conduct and the inference of that conduct, and Mekon's conduct is 100% consistent with waiver. And Mekon has suggested that Whalen is good law. So that was one thing that we were concerned with. But if it's good law, it's good law. And I mean, if this trilogy of cases, including Whalen, were viewed as a continuum, we're well beyond Whalen. For example, real briefly, in both Whalen and Galaxy v. Mekon, the general contractor failed to stop work when the corrected certificate was not forthcoming. In Whalen, the general contractor was not even in possession of the subcontractor's insurance certificate. Here they were. In Whalen, the general contractor was not named as an additional insured. In Galaxy and Mekon, they were. In Whalen, the contract had a provision allowing the contractor to withhold payment and deny its subcontractor access to the work site if acceptable insurance was not provided. Similarly, Galaxy. And in Galaxy, the general contractor reviewed and modified the subcontractor's insurance by direct contact with the subcontractor's insurance agent, which did not happen in Whalen. So in other words, in addition to all the persuasive facts that are similar in Whalen, here Mekon was unequivocally in possession of the subcontractor's insurance certificate and Mekon indisputably reviewed and tweaked the subcontractor's insurance. So if Whalen still broke law, our argument would be we're much more persuasive than Whalen and we would ask for the court to uphold Judge McGrath's, I would argue, very well-reasoned opinion. Thank you very much. Okay, thank you. A reply, Mr. Livingston, briefly? Following. I just have really two points to make. First is that I think it's interesting. This point was made in the brief. It was made here again by Mr. Zapata. Galaxy's position is that it's actually a more compelling case for waiver in this instance because Mekon actually received and reviewed certificates, as was not the case in Whalen and Guyer. I think that the opposite is actually true. What Mr. Zapata suggested was that Mekon would have been better off not to have reviewed the certificates in order to not show waiver. But that's exactly the case you have in Whalen and Guyer. And I think, again, it makes perfect sense in those cases. By stating that the party that they're contracting with is required to provide them certificates that show a level of insurance, and then not even following through with making sure that they provide them some certificates, I agree. In Whalen and Guyer, there is no other inference that you can draw other than they either intended to waive that provision or they did not care about that provision. Mekon's conduct clearly shows that it not only cared about the conditions that were present in the subcontract, but in every instance where they discovered that Galaxy was out of compliance, they took steps to try to bring Galaxy into compliance. What Galaxy seems to be suggesting is that by doing what they were supposed to do, but by being mistaken, that shows waiver. I think that that's not an argument that's supported by the case law, and that is dangerous in the construction context, given the practicalities of these large projects. The second point that I'd like to make is that Galaxy asked, what else was Galaxy supposed to do? And I think that there are several things that Galaxy could have done to ensure that we weren't here. Even if Galaxy, again, taking Mr. Salinas at his word that he believed that it had been waived, all they needed to do was make sure that that change of the subcontract actually got into the contract that he signed at a later date. He did not do that. There's no separate writing that indicates any waiver. There's not a separate side contract that indicates any waiver. There's not a communication between Mr. Salinas and Mr. Flynn, even, you know, sorry, not any communication confirming this alleged conversation or this alleged waiver. There's not even any internal communications, memos, notes, anything else, that, you know, indicates that Galaxy believed that there was a waiver. What you have is the signature by the president of Galaxy agreeing to very explicit terms for insurance. Mekon following through with its obligations under that contract. And its conduct, I think, is clearly consistent with an actual mistake on its part and a clear intent to hold Galaxy to the specific provisions of the subcontract. With that, unless you have any other questions, I'd ask that you reverse the trial court below. And thank you, judges. Thank you for the arguments, gentlemen, and thank you for the briefs. This case will be taken under investigation.